**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
*Southern Division*

PASTERNAK & FIDIS, P.C.,          *

      **Plaintiff,**          *

v.                                *        **Case No.: PWG-14-2015**

RECALL TOTAL INFORMATION    *
MANAGEMENT, INC.,
                                 *

      **Defendant.**         *

*   *   *   *   *   *   *   *   *   *   *   *   *

**MEMORANDUM OPINION**

Plaintiff, a law firm, entered into an agreement with Defendant, under which Defendant would store Plaintiff's clients' documents and files, including original-signature documents in a secure, climate-controlled environment in Defendant's document storage facility.  When an accident in 2012 resulted in the destruction of numerous documents at the facility (but none of the documents in the secure storage), Plaintiff learned that its original-signature documents had not been stored securely or refiled properly, as promised.  These documents were ruined, and Plaintiff filed suit for breach of contract, bailment liability, negligence, gross negligence, fraud, and unfair business practices.  Defendant has moved to dismiss,[1] contending that Plaintiff fails to state a claim for gross negligence, fraud, or unfair business practices, and its liability on the remaining claims is limited to $620, such that Plaintiff cannot meet this Court's jurisdictional minimum.  Alternatively, Defendant moves for summary judgment on the basis of accord and

---

[1] Defendant's Motion to Dismiss for Failure to Establish Jurisdiction or, in the Alternative, for Summary Judgment on the Basis of Accord and Satisfaction, ECF No. 5, has been briefed fully. ECF Nos. 5-1, 12 & 13.  A hearing is not necessary. *See* Loc. R. 105.6.

satisfaction.  Because Plaintiff has not stated a claim under either the Georgia or Maryland consumer protection statute, I will dismiss its claim for unfair business practices.  But, given that Plaintiff has stated claims for gross negligence and fraud, I will deny Defendant's motion to dismiss the remaining claims.  Further, because a genuine dispute exists as to whether Plaintiff agreed to release its claims in exchange for a credit to its account, I will deny Defendant's motion for summary judgment as to the affirmative defense of accord and satisfaction.

## I.      BACKGROUND[2]

Plaintiff Pasternak & Fidis, P.C. ("P&F") is a law firm that derives more than half its revenue from its estate planning and administration practice, for which it prepares "wills and other estate planning and administration documents bearing original signatures." Compl. ¶¶ 1, 10, 63, ECF No. 1.   P&F entered into a document storage and delivery agreement (the "Agreement") in 2005, with Defendant Recall Total Information Management, Inc. ("Recall"), a business that "maintains . . . off-site commercial document warehouses," including one in Landover, Maryland, to provide its customers with "secure document storage, management, indexing, archiving, retrieval, and delivery." *Id.* ¶¶ 2, 12.  "Recall advertise[d] that it 'provides state-of-the-art, climate-controlled storage, high-security vault protections for items of high intrinsic value'" through "'[s]ecure document storage facilities'" ("Vault Storage"), "'built to sustain severe weather.'" *Id.* ¶ 5 (quoting www.recall.com/solutions/protect (last visited July 19, 2014)).

P&F designated its boxes of original-signature documents "1586-S," so that they would be "stored in the vault area storage area of the Landover Facility," i.e., Vault Storage; these were

---

[2] For purposes of considering Defendant's Motion to Dismiss, I accept as true the facts that Plaintiff alleged in the Complaint.  *See Aziz v. Alcolac*, 658 F.3d 388, 390 (4th Cir. 2011).

referred to as "Vault Boxes" that contained "Vault documents" or "Vault items." Compl. ¶¶ 13–15. Its other boxes, designated "1586," were "stored in the regular warehouse portion of the Landover Facility." *Id.* ¶ 13. "P&F's understanding and agreement with Recall was that boxes of documents designated '1586-S' would be kept in the vault," and that, when P&F needed a file from an "1586-S" box, Recall would retrieve it "and then promptly return[]" it "to the vault" and refile it "to ensure the safety of these files." *Id.* ¶ 14. The parties discussed the process and importance of Vault Storage and prompt refiling of the "Vault documents" on "multiple occasions." *Id.* ¶ 16–23.

On June 28, 2012, "a temporary employee working for Recall crashed an order picker (a vehicle similar to a forklift) into a storage rack holding cartons at the Landover Facility, causing successive racks to fall in a domino effect, damaging an exterior wall, and ultimately causing a portion of the roof to collapse;" one Recall employee died in the accident. Compl. ¶¶ 27, 29, 53. As a result, 310 items that P&F had in storage at the Landover Facility, including 9 Vault Boxes and 145 "individual file folders that had been designated by P&F for Vault Storage" ("Vault Files"),[3] were destroyed. *Id.* The Vault Storage area was not affected; the Vault Files that were destroyed were items that Recall had not filed properly. *Id.* ¶¶ 41, 46, 48. Specifically, the destroyed files were "files that P&F had requested for retrieval, then sent back to Recall for re-filing" at least four months earlier, and in some instances more than four years earlier. *Id.* ¶¶ 54, 57. Specifically, Recall received for refiling 2 Vault Files in 2008, 1 in 2009, 5 in 2010, 112 in 2011, and 25 on February 13, 2012. *Id.* ¶ 57. The fact that "individual file folders were destroyed (but not the boxes that they were supposed to be filed in)" suggests that "these files must have been loose somewhere in Recall's main warehouse area, rather than properly filed and

---

[3] Although Recall reported the destruction of 147 Vault Files, P&F later determined that 2 of the Vault Files actually were not destroyed. Compl. ¶ 57.

secured" in Vault Storage.  *Id.* ¶ 55.  "Recall's Account Manager admitted that 'during all of this that all of [P&F's] Safe documents were not in the correct place,'" and "Recall's Operations Manager acknowledged that P&F's original documents had not been kept in the vault area." *Id.* ¶¶ 46, 48.

Maryland Occupational Safety and Health ("MOSH") investigated the accident and determined that "Recall failed to certify that its temporary employee was trained on the order picker he was operating at the time of the incident," and that another employee previously was terminated "for striking a rack with an order picker."  Compl. ¶¶ 30, 32, 33.  It further determined that the thirty-three foot high storage racks "were poorly designed and installed in a manner that created dangerous conditions," and "were not suitable for Recall's use as storage for cartons of documents," and that the "boxes were unsafely stacked." *Id.* ¶¶ 34, 36, 39.  MOSH also noted that the warehouse roof previously had "failed, and had to be rebuilt." *Id.* ¶ 35.

The Vault Boxes and Vault Files contained "the estate planning documents of 399 clients," each of whom had "[o]n average, . . . between five and ten original documents in their file." *Id.* ¶ 61.  Plaintiff alleged that it incurred expenses inventorying its files and republishing the original-signature documents, as well as "additional probate costs due to the lack of original estate documents," and damage to its business through loss of reputation. *Id.* ¶¶ 65, 66.  Yet the Agreement[4] limited Defendant's liability as follows:

---

[4] To rule on a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), the Court may consider "any 'document that the defendant attaches to its motion to dismiss if the document was integral to and explicitly relied on in the complaint and if the plaintiffs do not challenge its authenticity.'" *Tucker v. Specialized Loan Servicing, LLC*, ---- F. Supp. 3d ----, 2015 WL 452285, at *8 (D. Md. Feb. 3, 2015) (quoting *CACI Int'l v. St. Paul Fire & Marine Ins. Co.*, 566 F.3d 150, 154 (4th Cir. 2009) (citations and quotation marks omitted)).  Defendant attached the Agreement to its Motion. The Agreement "was integral to and explicitly relied on in the complaint," and Plaintiff does not challenge its authenticity.  *See id.*

(A) IN THE EVENT OF ANY LOSS, DAMAGE OR DESTRUCTION OF CUSTOMER MATERIALS CAUSED BY RECALL'S BREACH OF ANY OBLIGATION TO CUSTOMER, RECALL'S LIABILITY SHALL BE LIMITED TO $2.00 PER REGISTERED CARTON, CONTAINER, DISKETTE, TAPE, OR OTHER SUCH ITEM. (B) WITH RESPECT TO ANY OTHER CLAIMS, INCLUDING, WITHOUT LIMITATION ANY FAILURE OR DELAY IN THE PERFORMANCE OF A SERVICE, RECALL'S LIABILITY SHALL BE LIMITED TO (I) THE FEE PAID BY CUSTOMER FOR THE PARTICULAR SERVICE, AND (II) IN NO EVENT WILL RECALL'S LIABILITY EXCEED A MAXIMUM AMOUNT EQUAL TO THE FEES PAID HEREUNDER DURING THE 12-MONTHS IMMEDIATELY PRIOR TO THE DATE OF CUSTOMER'S FIRST CLAIM, EXCEPT AS MAY OTHERWISE BE REQUIRED BY APPLICABLE LAW. (C) NOTWITHSTANDING ANYTHING IN SUBSECTIONS (A) OR (B) ABOVE OR ANY OTHER PROVISION IN THIS AGREEMENT, IN NO EVENT SHALL RECALL BE LIABLE TO CUSTOMER OR ANY OTHER PERSON, WHETHER IN CONTRACT OR IN TORT, OR UNDER ANY OTHER LEGAL THEORY (INCLUDING WITHOUT LIMITATION, NEGLIGENCY [SIC] OR STRICT LIABILITY) FOR LOSS, DAMAGER OR DESTRUCTION OF ANY INFORMATION OR DATA CONTAINED IN ANY CUSTOMER MATERIALS, FOR THE COST OF RECREATING SUCH INFORMATIN [SIC], FOR LOST PROFITS OR REVENUES, LOSS OF USE OR SIMILAR ECONOMIC LOSS, OR FOR ANY INDIRECT, INDICANTAL [SIC], CONSEQUENTIAL OR SIMILAR DAMAGES ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT OR ANY SERVICES PROVIDED BY RECALL, OR FOR ANY CLAIM AGAINST CUSTOMER BY ANY OTHER PERSON, EVEN IF RECALL HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH CLAIM.

Agr. § 10, Def.s' Mem. Ex. A, ECF No. 5-3.  It also stated:

Customer has the option of paying increased fees to increase the liability of Recall in express [sic] of the amount described in Section 10A, but such option can be exercised only by written agreement made with Recall specifying the increased limit of Recall's liability and the increased fee to be paid by the Customer for the added liability to Recall.

*Id.* § 15(b).  It is undisputed that Plaintiff did not exercise its right to increase Recall's liability

under the Agreement.  The Agreement also includes a choice-of law-provision, electing Georgia

law to govern contractual disputes, *id.* § 15(d), and an integration clause stating that "these terms

and conditions constitute the entire agreement between Recall and [P&F] with respect to the

subject matter hereof and supersede any prior discussions, agreements and representations," *id.* ¶ 16.

Undeterred by the limitation of liability clause, Plaintiff filed suit, claiming negligence (Count I); gross negligence (Count II); bailment liability (Count III); breach of contract (Count IV); fraud (Count V); and unfair business practices under Georgia's Fair Business Practices Act ("FBPA"), Ga. Code Ann. § 10-1-390, and Maryland's Consumer Protection Act ("MCPA"), Md. Code Ann., Com. Law § 13- 101 *et seq.* (Count VI).  Defendant moves to dismiss pursuant to Fed. R. Civ. P. 12(b)(1) and (6), arguing that Plaintiff "failed to state a claim for gross negligence, fraud, or for violation of the consumer protection/unfair business practices statutes," and recovery under the remaining claims is contractually limited to $620.00, such that the case must be dismissed for lack of jurisdiction. Def.'s Mot. 1.   Alternatively Recall moves for summary judgment pursuant to Fed. R. Civ. P. 56 on "the basis of accord and satisfaction because Recall has previously compensated P&F well in excess of any possible claim under the contract." *Id.*

## II.      MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM

### A.  Standard of Review

Pursuant to Federal Rule of Civil Procedure 12(b)(6), this Court may dismiss a claim or complaint if it fails to state a claim upon which relief can be granted.  *Tucker v. Specialized Loan Servicing, LLC*, ---- F. Supp. 3d ----, 2015 WL 452285, at *8 (D. Md. Feb. 3, 2015).  This rule's purpose "is to test the sufficiency of a complaint and not to resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses."  *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006).  To that end, the Court bears in mind the requirements of Rule 8, *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662

(2009), when considering a motion to dismiss pursuant to Rule 12(b)(6). Specifically, a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), and must state "a plausible claim for relief," as "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice," *Iqbal*, 556 U.S. at 678–79. *See Velencia v. Drezhlo*, No. RDB-12-237, 2012 WL 6562764, at \*4 (D. Md. Dec. 13, 2012) (discussing standard from *Iqbal* and *Twombly*). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 663.

"Generally, when a defendant moves to dismiss a complaint under Rule 12(b)(6), courts are limited to considering the sufficiency of allegations set forth in the complaint and the 'documents attached or incorporated into the complaint.'" *Zak v. Chelsea Therapeutics Int'l, Ltd.*, ---- F.3d ----, 2015 WL 1137142, at \*7 (4th Cir. 2015) (quoting *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 448 (4th Cir. 2011)). However, the Court also may consider "any 'document that the defendant attaches to its motion to dismiss if the document was integral to and explicitly relied on in the complaint and if the plaintiffs do not challenge its authenticity.'" *Tucker v. Specialized Loan Servicing, LLC*, ---- F. Supp. 3d ----, 2015 WL 452285, at \*8 (D. Md. Feb. 3, 2015) (quoting *CACI Int'l v. St. Paul Fire & Marine Ins. Co*., 566 F.3d 150, 154 (4th Cir. 2009) (citation and quotation marks omitted)). As noted, Defendant attached the Agreement to its Motion. The Agreement "was integral to and explicitly relied on in the complaint," and Plaintiff does not challenge its authenticity. *See id.*

### B.  Gross Negligence – Count II

#### 1.  *Choice of law*

The choice-of-law provision in the Agreement provides, in full, that "[t]his Agreement shall be governed by the laws of the State of Georgia, without regard to its principles or conflicts of law." Agr. § 15(d).  P&F contends that Georgia law should govern the gross negligence claim as well as the contract claims, because a finding of gross negligence would invalidate the Agreement's exculpatory provisions, inasmuch as, in Plaintiff's view, the tort claim is closely related to the contract claims.  Pl.'s Opp'n 12.  According to Plaintiff, "'[w]here a choice of law clause in the contract is sufficiently broad to encompass contract-related tort claims,' courts have honored the parties' choice of law."  *Id.* (quoting *Hitachi Credit Am. Corp. v. Signet Bank*, 166 F.3d 614, 628 (4th Cir. 1999)).  Recall insists that Maryland law should apply to the gross negligence claim because Maryland, the forum state, "follows the *lex loci delicto* rule in analyzing choice-of-law for tort claims" and, "[u]nder *lex loci delicto*, the law of the state where the alleged tort was committed applies."  Def.'s Mem. 13 (citing *Ben-Joseph v. Mt. Airy Auto Transporters, LLC*, 529 F. Supp. 2d 604, 606 (D. Md. 2008)).  Noting that "[w]here the events giving rise to the action took place in more than one state, the law of the state where the injury was suffered is considered to be the state where the tort was committed," Recall asserts that the alleged injury in this case occurred in Maryland. *Id.* (citing *Ben-Joseph*, 529 F. Supp. 2d at 606–07).

In *Hitachi*, the plaintiff brought breach of contract claims, as well as fraud claims based on fraudulent inducement to enter the contract.   166 F.3d at 620, 623.  The choice-of-law language in the contract at issue "explicitly call[ed] for the application of Virginia law in the interpretation of '[the] Agreement and the rights and obligations of the parties [t]hereunder . . .

including all matters of construction, validity and performance.'" *Id.* at 624.  The Fourth Circuit "recogniz[ed] the close relationship of the tort claims to the contract" and concluded that Virginia law applied to the fraud claims, reasoning that the choice-of-law language in the contract "indicate[d] that the parties intended to cover more than merely contract claims." *Id.* at 628.  There is no such indication in the Agreement between P&F and Recall, which, as noted, simply provides that it "shall be governed by the laws of the State of Georgia, without regard to its principles or conflicts of law." Agr. § 15(d).  And, the relationship of the gross negligence claim to the contract claim is significantly more attenuated than the relationship between the contract and fraudulent inducement claims in *Hitachi*.  The fraudulent inducement claim called into question the validity of the entire contract in *Hitachi*, whereas the gross negligence claim in this case would not invalidate the entire Agreement, even if Plaintiff were able to recover damages in excess of those provided for by one contractual clause.  Moreover, this Court has applied the law of the state where the injury occurred under extremely similar circumstances. *See Great N. Ins. Co. v. Recall Total Mgmt., Inc.*, No. TDC-13-1829, 2014 WL 3845891, at *3 (D. Md. Aug. 1, 2014) (stating that "[a]lthough New York law may apply to Plaintiff[']s claims of breach of contract and bailment, gross negligence is a tort claim, to which Maryland law applies," with regard to claims brought by subrogee of another law firm that used Recall's storage facility and whose files also were damages in the June 28, 2012 accident).  Thus, given that the injury occurred in Maryland, I will apply Maryland law to the gross negligence claim. *See id.*; *Ben-Joseph*, 529 F. Supp. 2d at 607 (stating that, under Maryland conflict of law jurisprudence, the "the law of the place of injury" applies in tort actions).

### 2. *Stating a claim*

To state a claim for gross negligence, "as with other negligence claims, [a plaintiff] must allege a duty of care, a breach of that duty, and damages as a proximate cause of the breach." *Swedish Civil Aviation Admin. v. Project Mgmt. Enters., Inc.*, 190 F. Supp. 2d 785, 803 (D. Md. 2002) (stating elements for professional malpractice, another form of negligence).  Additionally, the plaintiff must allege that the defendant "'intentional[ly] fail[ed] to perform a manifest duty in reckless disregard of the consequences as affecting the life or property of another'" or "'thoughtless[ly] disregard[ed] the consequences [of its breach of duty] without the exertion of any effort to avoid them.'" *Brooks v. Jenkins*, 104 A.3d 899, 908 (Md. Ct. Spec. App. 2014) (quoting *Barbre v. Pope,* 935 A.2d 699, 717 (Md. 2007) (emphasis removed) (citation omitted)). Put another way, a defendant is liable for gross negligence "'only when he inflicts injury intentionally or is so utterly indifferent to the rights of others that he acts as if such rights did not exist.'" *Id.* (quoting *Barbre*, 935 A.2d at 717 (emphasis removed) (citation omitted)).

### a. Causation

As for the causation element, P&F must allege that Recall's "negligence was 'both a cause in fact of the injury and a legally cognizable cause.'" *Casey v. Geek Squad Subsidiary Best Buy Stores, L.P.*, 823 F. Supp. 2d 334, 351 (D. Md. 2011) (quoting *Young v. United States,* 667 F. Supp. 2d 554, 561 (D. Md. 2009) (citing *Pittway Corp. v. Collins,* 409 Md. 218, 973 A.2d 771, 786 (2009))).

> The "cause in fact" inquiry "concerns whether defendant's negligent conduct actually produced an injury." *Id.* Maryland courts consider two tests in determining whether causation-in-fact exists: the "but for" test and the substantial factor test. *Id.* at 562. The "but for" test considers whether the injury "would not have occurred absent defendant's negligent conduct." *Id.* The substantial factor test applies in situations where more than one independent negligent act may be responsible for a plaintiff's injury. *See id.* Under the substantial factor test, an

action is viewed as the cause of an injury only if the action was a "'substantial factor' in bringing about plaintiff's injury." *Id.*

The "legal causation" inquiry is "'a policy-oriented doctrine designed to be a method for limiting liability after cause-in-fact has been established.'" *Id.* at 561 (quoting *Pittway Corp.*, 973 A.2d at 786). Commonly, this inquiry "involves a determination of whether the injuries were a foreseeable result of the negligent conduct." *Pittway Corp.*, 973 A.2d at 788; *see also Henley v. Prince George's Cnty.*, 503 A.2d 1333, 1340 (1986) ("In applying the test of foreseeability [or, legal causation] ... it is well to keep in mind that it is simply intended to reflect current societal standards with respect to an acceptable nexus between the negligent act and the ensuing harm, and to avoid the attachment of liability where ... it appears 'highly extraordinary' that the negligent conduct should have brought about the harm.").

*Casey*, 823 F. Supp. 2d at 351.

Here, the alleged cause of Plaintiff's injury was Defendant's failure to file 9 Vault Boxes properly and failure to refile 145 Vault Files that it had received for refiling months or even years earlier. But for Defendant's failure to file these items in the Vault Storage area for which they were designated, these items would not have been destroyed, as the Vault Storage area was not affected by the roof collapse. Similarly, even if the roof collapse could qualify as an "independent negligent act," the failure to file these items in Vault Storage certainly was a "substantial factor in bringing about plaintiff's injury," as the roof collapse, without the filing failure, would not have injured the Vault Files or the Vault Boxes. *See Casey*, 823 F. Supp. 2d at 351 (citations and quotation marks omitted); *Young*, 667 F. Supp. 2d at 562. Therefore, Plaintiff sufficiently alleged causation-in-fact. *See Casey*, 823 F. Supp. 2d at 351.

As for legal causation, or foreseeability, Plaintiff correctly notes, Pl.'s Opp'n 22, that "'the pertinent inquiry is not whether the actual harm was of a particular kind which was expectable. Rather, the question is whether the actual harm fell within a general field of danger which should have been anticipated.'" *Foor v. Juvenile Servs. Admin.*, 552 A.2d 947, 955 (1989) (quoting *Segerman v. Jones*, 259 A.2d 794, 805 (Md. 1969) (citation omitted)). Here, Plaintiff

designated its Vault Boxes and Vault Files for Vault Storage because they wanted to prevent their damage or destruction, and Defendant offered Vault Storage for that purpose. Therefore, their damage or destruction outside Vault Storage clearly should have been foreseeable. *See id.* It is not material that they were destroyed due to a roof collapse rather than something akin to humidity, because "'the actual harm'" fell within the "'general field of danger'"—document destruction—that "'should have been anticipated.'" *See id.* Moreover, the collapse of the roof was reasonably foreseeable, given that the warehouse roof previously had "failed, and had to be rebuilt." *See* Compl. ¶ 35.

Defendant insists that it did nothing but fail to file the documents in Vault Storage, which, in its view, cannot expose it to liability for gross negligence. *See* Def.'s Reply 10. While it is true that "[n]egligence that does nothing to cause a mishap cannot create accountability," *Myers v. Bright*, 609 A.2d 1182, 1188 (Md. 1992), and that "coincidental negligence . . . that does not contribute to the accident is immaterial," *Rosenthal v. Mueller*, 720 A.2d 1264, 1269–70 (Md. 1998), neither is the case here. Defendant's duty with regard to the Vault Boxes and Vault Files was not simply to store and refile Plaintiff's documents, and the documents at issue were not designated for general storage in the warehouse. These are not circumstances under which documents slated for general storage were damaged because they were misfiled within the part of the general storage area affected by the roof collapse. Rather, Defendant, as a bailee in a "'bailment for profit,'" had "'a duty to use ordinary care and diligence *in safeguarding* the bailor's property.'" *Schleisner Co. v. Birchett*, 96 A.2d 494, 496 (Md. 1953) (quoting *Gen. Refining Co. v. Int'l Harvester Co.*, 196 A. 131, 136 (Md. 1938)) (emphasis added).[5] And, with

---

[5] *Cf. Mickey v. Sears, Roebuck & Co.*, 76 A,2d 350, 352 (gratuitous bailee has "a duty to use ordinary care to return [bailment] to the owner"). A bailee in a "bailment for profit" is distinct from a "professional bailee," as a professional bailee is not only one who profits from the

regard to the documents at issue, Defendant agreed to return the Vault Files to their proper boxes and to store them in Vault Storage to ensure their preservation.  Thus, the documents' destruction was a foreseeable result of Defendant's failure to file them in Vault Storage; if damage or destruction were not a foreseeable result of a failure to file them, then the documents would not have been designated for Vault Storage in the first place.

Defendant also argues that their destruction was not foreseeable because the negligent acts of failing to file the Vault Boxes properly and to refile the Vault Files were not "'unbroken by any intervening agency.'"  Def.'s Mem. 30 (quoting *Collins v. Li*, 933 A.2d 528, 570 (Md. Ct. Spec. App. 2007) (citation omitted)).  Certainly, the roof collapse was a separate act from the failure to file.  But, Plaintiff claims that there is only one actor responsible for both acts—Defendant—, and Plaintiff has alleged that the roof collapse was part of Defendant's ongoing negligent handling of its contractual obligations to store Plaintiff's documents securely.  Specifically, Plaintiff has alleged that Defendant caused the roof collapse by allowing an uncertified driver to operate a forklift-like vehicle under dangerous conditions with the knowledge that another driver previously hit a storage rack with a forklift. Plaintiff also has alleged that, at that time, Defendant had failed to store properly or refile its Vault Boxes and Vault Files.

---

bailment but also one "who make[s] it [its] principal business to act as [a] bailee[] and who deal[s] with the public on a uniform and not an individual basis as evidenced by the fact that [its] contracts, as a rule, are printed on identification tokens or are posted in [its] place of business." 175 A.L.R. 8, § 55.  Moreover, to the extent that Defendant argues that it can exculpate itself from liability for negligence because it is not a professional bailee, as discussed further in Part II.B.3, I note that the ability of an ordinary bailee to "limit or completely exculpate himself from any liability for loss or damage to the bailed property" under either Maryland or Georgia law pertains only to damage that is "a result of his own *simple* negligence."  *Ellerman v. Atlanta Am. Motor Hotel Corp.*, 191 S.E.2d 295, 296 (Ga. Ct. App. 1972) (emphasis added); *see Wolf v. Ford*, 644 A.2d 522, 525 (Md. 1994) ("[A] party will not be permitted to excuse its liability for intentional harms or for the more extreme forms of negligence, i.e., reckless, wanton, or gross.").

Moreover, Defendant fails to acknowledge that the language it quoted from *Collins* regarding "intervening agency," which the *Collins* Court in turn quoted from *Bloom v. Good Humor Ice Cream Co.*, 18 A.2d 592 (Md. 1941), "has been limited by subsequent decisions of the Court of Appeals." *Collins*, 933 a.2d at 570.  For example, in *Matthews v. Amberwood Assocs. Ltd. P'ship*, 719 A.2d 119 (Md. 1998), the Court of Appeals "emphasized that 'the intervening negligence is not a superseding cause if it is reasonably foreseeable.'" *Collins*, 933 A.2d at 570 (quoting *Matthews*, 719 A.2d 119).  Here, as noted, the otherwise-unusual events of a warehouse employee crashing his order picker into a storage rack and a roof collapse are reasonably foreseeable because both had happened previously.  Thus, the accident is not a superseding cause. *See Matthews*, 719 A.2d 119. Therefore, Plaintiff has alleged foreseeability adequately.  *See id.*; *Collins*, 933 A.2d at 570; *Casey*, 823 F. Supp. 2d at 351.

### b.  Reckless disregard

Defendant also challenges Plaintiff's pleading of "extreme, wanton, or reckless behavior."  Def.'s Mem. 33.  As noted, negligence rises to gross negligence when the plaintiff "'intentional[ly] fail[s] to perform a manifest duty in reckless disregard of the consequences as affecting the life or property of another'"; "'thoughtless[ly] disregard[s] the consequences [of its breach of duty] without the exertion of any effort to avoid them'"; "'inflicts injury intentionally'"; or "'is so utterly indifferent to the rights of others that he acts as if such rights did not exist.'" *Brooks v. Jenkins*, 104 A.3d 899, 908 (Md. Ct. Spec. App. 2014) (quoting *Barbre v. Pope*, 935 A.2d 699, 717 (Md. 2007) (emphasis removed)).  In Defendant's view, its failure to file documents "is not leaving a pit of scalding water uncovered in an area where children had been playing or cutting the telecommunications cables to the reservation center of a major corporation, which are not gross negligence in Maryland."  Def.'s Mem. 36.

A review of the Maryland cases Defendant cites shows that the defendants' conduct in those cases is dissimilar to Recall's conduct in this case. In *Medina v. Meilhammer*, 489 A.2d 35, 37 (Md. Ct. Spec. App. 1985), maintenance workers left "scalding water located in a hole" unattended, and a child fell in and was severely injured. The court noted that the workers knew that they "would have to walk to the supply depot to obtain the materials" to secure the hole, during which time "the hole which had filled with scalding water would be left unguarded; that in the area there were children who were not only attracted to the water, but had in fact played in it when it was cooler; . . . that the hole had been only partially secured"; and that they "had neither adopted nor implemented" safety procedures. *Id.* at 41. But the court also observed that the workers "warned several children . . . to leave the area and play elsewhere," such that they "did not see any children in the area" when they left the hole unattended; they "told some adults, who were nearby, to keep their children away from the hole"; and they covered approximately two-thirds of the opening" with a piece of plywood. *Id.* at 37. The court concluded that the conduct of the workers was "clearly negligent" but "not so extraordinary or outrageous as to raise that conduct to the qualitative level necessary to establish a foundation for the award of punitive damages." *Id.* at 41. Likewise, in *Marriott Corp. v. Chesapeake & Potomac Telephone Co.*, 723 A.2d 454, 480–81 (Md. Ct. Spec. App. 1998), the court concluded that the defendant was not grossly negligent when its cable locator mismarked the location of the cable, reasoning that the locator "consulted C & P's plats before attempting to locate the cable," followed procedures, and "demonstrated a thorough understanding of the proper operation of the [cable-locating] device."

Here, in contrast, Plaintiff alleges that Defendant promoted the security of its Vault Storage but then did not take any measures at all to safeguard Plaintiff's Vault Boxes and Vault

Files, as it was obligated to do, by filing them in Vault Storage, as it promised.  According to the Complaint, Defendant did not file any of the Vault Boxes in Vault Storage, despite their "1586-S" labels, and failed to return 145 Vault Files to their Vault Boxes, which were not in Vault Storage anyhow, despite having at least four months (and more than four years in two instances) to do so.  Plaintiff claims that it discussed proper filing with Defendant repeatedly.  Plaintiff also alleges that the conditions of Defendant's warehouse were dangerous, the boxes were stacked precariously, order pickers ran into the "poorly designed" storage racks twice, the temporary employee whose collision in an order picker caused the June 2012 accident was not certified, and the roof had collapsed once before.  Compl. ¶¶ 32–39.  Unlike in *Medina* and *Marriot Corp.*, in which the court considered summary judgment motions, Plaintiff's Complaint is before me on a motion to dismiss, which it can survive if the factual content of Plaintiff's Complaint "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 663.  Plaintiff's allegations regarding Defendant's handling of Plaintiff's documents, coupled with the allegations about the warehouse,[6] are sufficient to allege that Defendant "'thoughtless[ly] disregard[ed] the consequences [of its breach of duty] without the exertion of any effort to avoid them.'"  *Brooks*, 104 A.3d at 908; *Barbre*, 935 A.2d at 717. Taking the allegations in the Complaint as true, Plaintiff has stated a claim for gross negligence. *See Casey*, 823 F. Supp. 2d at 351; *Brooks*, 104 A.3d at 908; *Barbre*, 935 A.2d at 717. Defendant's Motion to Dismiss is denied as to Count II.  *See* Fed. R. Civ. P. 12(b)(6).

---

[6] Indeed, after initially concluding that Great Northern Insurance Co. failed to state a claim for gross negligence because "Plaintiff['']s pleadings . . . were 'conclusory factual assertions,'" and dismissing the claim without prejudice to filing an amended complaint, this Court denied Recall's motion to dismiss the gross negligence claim in the amended complaint based on these circumstances at the warehouse.  *See Great N. Ins. Co. v. Recall Total Mgmt., Inc.*, No. TDC-13-1829, 2014 WL 3845891, at *2, *4 (D. Md. Aug. 1, 2014).

### 3. *Economic loss doctrine*

Defendant contends that, even if Plaintiff sufficiently pleaded gross negligence, the economic loss doctrine would bar recovery of consequential damages and limit damages to the amount available for breach of contract ($620.00) because "the gross negligence claim is based on the same allegation as the breach of contract claim – Recall's alleged failure to place certain cartons in climate-controlled storage, and the economic damages sought arise solely out of the alleged misplacement of the cartons." Def.'s Mem. 38–39. Defendant insists that "plaintiffs cannot avoid contractual limitations and obtain consequential economic damages by styling an action that is governed by a contract as a tort." *Id.* at 16.

Defendant relies, *id.*, on *Potomac Constructors, LLC v. EFCO Corp.*, 530 F. Supp. 2d 731, 737 (D. Md. 2008), in which this Court concluded that the plaintiff's claim for negligent design of "formwork" used in constructing a bridge pursuant to a contract between the parties was "partially barred by the economic loss doctrine," under which "plaintiffs are generally precluded from beginning negligence actions to recover purely economic losses."  Yet, Defendant concedes that "[n]either Maryland nor Georgia has addressed the economic loss rule in a case alleging gross negligence where the duties were prescribed in a contract between private parties." Def.'s Mem. 38.  Perhaps this is because Defendant's reliance is misplaced, as *Potomac Constructors* and the line of case law that this Court cited in *Potomac Constructors—Lloyd v. Gen. Motors Corp.*, 916 A.2d 257, 265-66 (Md. 2007), and *U.S. Gypsum Co. v. Mayor & City Council of Balt.*, 647 A.2d 405 (Md. 1994)—pertains to defective products, not grossly negligent services.  In *Lloyd*, a products liability case, the Maryland Court of Appeals noted that "[t]raditionally, damages in *products liability cases*" fall into three categories, one of which is economic loss, and that "[o]rdinarily . . . damages for economic loss are not available in a tort

action and are recoverable, if at all, in contract causes of action."  916 A.2d at 265 (emphasis

added).   In *U.S. Gypsum Co.*, the Maryland Court of Appeals likewise observed that,

"[t]raditionally, in cases to recover damages *because of defective products*, the loss of value or

use of *the product* itself, and the cost to repair or replace *the product*, have usually been viewed

as economic losses," for which "[t]ort recovery . . . has ordinarily not been allowed."  647 A.2d

at 410 (emphasis added).   The court stated that "a purchaser suffering only economic loss

*because of a defective product* will normally be limited to contract causes of action . . . ."  *Id.*

(emphasis added).

Nonetheless, it is true that "plaintiffs are generally precluded from bringing negligence

actions to recover purely economic losses."  *Potomac Constructors*, 530 F. Supp. 2d at 737.

Indeed, "'[t]he mere negligent breach of a contract, absent a duty or obligation imposed by law

independent of that arising out of the contract itself, is not enough to sustain an action sounding

in tort.'"  *Jacques v. First Nat'l Bank of Md.*, 515 A.2d 756, 759 (Md. 1986) (quoting *Heckrotte*

*v. Riddle*, 168 A.2d 879, 882 (Md. 1961)); *see Donnelly v. Branch Banking & Trust Co.*, ---- F.

Supp. 3d ----, 2015 WL 926022, (D. Md. Mar. 3, 2015) (citing *Jacques*).   But, when an

independent duty exists and there is an "intimate nexus," such as a contract, between the parties,

tort liability arises from "the failure to exercise due care," even when only economic loss ensues.

*Jacques*, 515 A.2d at 759–60.

Here, the losses are purely economic, but the necessary criteria exist for tort liability.

The Agreement provides the "intimate nexus," *see id.*, and Recall has an independent duty as a

bailee.[7]   *See Schleisner Co. v. Birchett*, 96 A.2d 494, 496 (Md. 1953) (noting that, in a bailment

---

[7] Although the parties dispute whether Recall is a "professional bailee" or an "ordinary bailee,"
they agree that Recall is a bailee.  Def.'s Mem. 18–19 (defining Recall as an 'ordinary bailee'");
Pl.'s Opp'n 40.

for profit, which exists "'for the mutual benefit of the parties,'" the bailee is "'under a duty to use ordinary care and diligence in safeguarding the bailor's property, and subject to liability for any failure to perform that duty.'" (quoting *Gen. Refining Co. v. Int'l Harvester Co.*, 196 A. 131, 136 (Md. 1938)).

Defendant insists that, as a bailee, it can enter into a contract limiting its liability. Def.'s Mem. 17. But, even though exculpatory clauses generally are permissible, "a party will not be permitted to excuse its liability for intentional harms or for the more extreme forms of negligence, i.e., reckless, wanton, or gross," *Wolf v. Ford*, 644 A.2d 522, 525–26 (Md. 1994), and here the claim is for gross negligence. *See Alexander v. Sports Authority, Inc.*, No. DKC-07-479, 2007 WL 1745328, at*4–5 (D. Md. June 14, 2007) (quoting *Wolf*). Under Georgia law, the result is the same, because "[a] party generally may not exculpate oneself by contract from liability for gross negligence or an intentional act" or "claims of fraud." *Asplundh Tree Expert Co. v. Emeritis LLC*, No. 06-cv-432-WSD, 2006 WL 1794744, at *6 & n.14 (N.D. Ga. June 27, 2006) (citing *Wade v. Watson,* 527 F. Supp. 1049, 1051 (N.D. Ga. 1981), *aff'd*, 731 F.2d 890 (11th Cir. 1984)); *D.L. Lee & Sons, Inc. v. ADT Sec. Sys., Mid-South, Inc.*, 916 F. Supp. 1571, 1583–84 (S.D. Ga. 1995) (applying Georgia law that "[a] clause in a contract limiting liability for negligent acts does not serve to limit liability for wilful or wanton conduct" and granting summary judgment to limit defendant's liability because there was "no evidence of wilful or wanton conduct or gross negligence"). Defendant has not cited any authority excepting bailees from this rule. Thus, the Agreement does not limit Plaintiff's recovery for gross negligence.

## C. Fraud – Count V[8]

### 1.  *Stating a claim*

Plaintiff claims that "Recall willfully misrepresented the location of P&F's Safe documents, by repeatedly providing assurances that the documents were in the vault."  Compl. ¶ 110.  Recall argues that Plaintiff fails to state a claim for fraud.  Def.'s Mem. 22.  Fraud is a statutory violation in Georgia, as Ga. Code Ann. § 51-6-2(a) provides that "[w]illful misrepresentation of a material fact, made to induce another to act, upon which such person acts to his injury, will give him a right of action."  To state a claim for fraud, Plaintiff must allege: "'(1) a false representation or omission of a material fact; (2) scienter; (3) intention to induce the party claiming fraud to act or refrain from acting; (4) justifiable reliance; and (5) damages.'" *UWork.com, Inc. v. Paragon Techs., Inc.*, 740 S.E.2d 887, 898 (Ga. Ct. App. 2013) (quoting *ReMax North Atlanta v. Clark,* 537 S.E.2d 138, 141 (Ga. Ct. App. 2000)).   Additionally, Plaintiff's fraud allegations must meet the "heightened pleading standard under Rule 9(b)." *Piotrowski v. Wells Fargo Bank, N.A.*, No. DKC-11-3758, 2013 WL 247549, at *5 (D. Md. Jan. 22, 2013).

> Rule 9(b) states that "in alleging a fraud or mistake, a party must state with particularity the circumstances constituting the fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Such allegations [of fraud] typically "include the 'time, place and contents of the false representation, as well as the identity of the person making the misrepresentation and what [was] obtained thereby.'" In cases involving concealment or omissions of material facts, however, meeting Rule 9(b)'s particularity requirement will likely take a different form. The purposes of Rule 9(b) are to provide the defendant with sufficient notice of the basis for the plaintiff's claim; to protect the defendant against frivolous suits; to eliminate fraud actions where all of the facts are learned only after discovery; and to safeguard the defendant's reputation.

---

[8] The parties agree that Georgia law, which the parties chose in the Agreement, applies to Count V.  Def.'s Mem. 12; Pl.'s Opp'n 12.

*Id.* (citations omitted); *see Spaulding v. Wells Fargo Bank, N.A.*, No. 12-1973, 2013 WL 1694549, at *9 (4th Cir. Apr. 19, 2013). "[A] plaintiff may of course attach a relevant document to the complaint if it helps him meet Rule 9(b)'s exacting standard . . . ." *Tenenbaum v. PNC Bank Nat'l Ass'n*, No. DKC-10-2215, 2011 WL 2038550, at *7 (D. Md. May 24, 2011).

Defendant challenges whether Plaintiff sufficiently alleged "facts showing knowledge of any false statements or intent to deceive," as well as the particularity of Plaintiff's allegations. Def.'s Mem. 23. According to Defendant, "P&F identifies only two communications from Recall employees prior to the collapse in 2012," and does not identify any false statements within those communications. *Id.* P&F counters that it adequately alleged a false statement "by showing that[] Recall's Account Managers . . . falsely assured P&F on numerous occasions that [the original-signature documents] were actually being stored in the vault." Pl.'s Opp'n 29 (citing Compl. ¶¶ 20, 22, 23, 24, 26).

> Careful examination of the Complaint reveals that Plaintiff has alleged:
>
> Recall's account managers stated on numerous occasions that this [promptly refiling Vault Files] was the process they were using for retrieval and refiling of P&F client files from the "1586-S" boxes in the vault storage area, and that they understood the importance of securely storing these documents bearing original signatures in the vault at the Landover Facility.

Compl. ¶ 23. While this is an allegation of repeated false statements, it does not provide the specificity that Rule 9(b) requires, as it provides neither the time nor place of any such statements. *See* Fed. R. Civ. P. 9(b); *Piotrowski*, 2013 WL 247549, at *5. Additionally, it does not identify the account managers who made the statements, although an earlier paragraph alleges that "Recalls Account Manager, Maureen Dowd (DeFrank), worked with P&F in September 2009 to resolve P&F's questions regarding the safe storage of P&F's Safe documents," Compl. ¶ 20, thereby arguably satisfying this requirement. *See* Fed. R. Civ. P. 9(b).

Plaintiff attaches the June 20, 2014 Affidavit of Mary Jane Tiedeman, P&F's firm administrator, to its Complaint.[9]  ECF No. 1-3.  Ms. Tiedeman declares:

> I discussed with Recall's account managers on multiple occasions that when these file folders were returned to the Landover Facility, they of course needed to be promptly refiled in the vault storage box from which they were retrieved, using the bar codes on the file folders and the 1586-S boxes.  Recall's account managers told me on numerous occasions that this was the process they were using for retrieval and refiling of P&F client files from the "1586-S" boxes in the vault storage area, and that they understood the importance of securely storing these documents bearing original signatures in the vault at the Landover Facility.

Tiedeman Aff. ¶ 9.  She identifies the account managers she spoke with in 2009 as "Maureen Dowd (later known as Maureen DeFrank) . . . and Michelle Morgan," and the account manager she spoke with in later years as "Nakisha Outlaw (later known as Nakisha Outlaw-Bellamy)." *Id.* ¶ 7.  Thus, Plaintiff alleges the identity of the people who allegedly made false statements, but it still has not alleged either the time or place of the statements. *See* Fed. R. Civ. P. 9(b); *Piotrowski*, 2013 WL 247549, at *5.

Yet, Tiedeman attaches two dated emails from Recall prior to Plaintiff's injury in June 2012 to show the false statements.  *See* Tiedeman Aff. ¶¶ 10–21 (describing Attachments A–L to include four emails that Tiedeman sent prior to the accident, two that she received on September 25, 2009 and October 27, 2009, and five emails that post-dated the accident).  Although two emails cannot substantiate Plaintiff's claim of "numerous occasions," the documents can demonstrate false statements with sufficient particularity for purposes of withstanding a motion to dismiss.  Additionally, Tiedeman states that she "retained . . . emails" as "records of the

---

[9] As noted, the Court may consider documents attached to the Complaint to determine whether Plaintiff met the Rule 9(b) pleading standard and to rule on Defendant's Rule 12(b)(6) motion. *Zak v. Chelsea Therapeutics Int'l, Ltd.*, ---- F.3d ----, 2015 WL 1137142, at *7 (4th Cir. 2015); *Tenenbaum*, 2011 WL 2038550, at *7. The Tiedeman Affidavit was attached as Exhibit 1 to the Complaint.

communications [she] had with Recall, . . . consistent with P&F's routine business practices," such that further evidence may be forthcoming.

In the September 25, 2009 email, under the subject line "Account 1586-S Inventory," Maureen Dowd stated:

> Per our conversation, we wanted to compare notes on the inventory lists to see which cartons, if any should not be in this level 2 account.  Please take a look at this and let me know what you think.  Secondly, I wanted to let you know that Michelle Morgan emailed me to say that she indexed cartons 10000975326.

Tiedeman Aff. Att. D.  This email suggests that boxes were stored in Vault Storage at the time, which Plaintiff contends is a false statement.  In the October 27, 2010 email, Nakisha Outlaw stated:

> Per our discussion, here is the inventory listing that we discussed, please review and let me know if everything is labeled correctly (ie, Vault items).  Once you have approved the correct locations of all cartons, I will then take the ones that are supposed to be vault cartons and will ensure that they are data entered.

Tiedeman Aff. Att. F.  This email suggests that "Vault items" would be stored properly going forward, another statement that Plaintiff claims is false.  Thus, considering the Complaint and all attachments to it, Plaintiff has alleged a false statement adequately.  *See* Fed. R. Civ. P. 9(b); *Piotrowski*, 2013 WL 247549, at *5.

Yet, as noted, Defendant also contends that Plaintiff has not pleaded that it had either the requisite knowledge or intent. Def.'s Mem. 23–24.  Defendant argues that Plaintiff failed to allege intent to deceive adequately because Recall did not bill P&F for Vault Storage for the boxes it did not place in Vault Storage; it "charged P&F only for the actual services rendered." *Id.* at 24.  Defendant appears to suggest that it only would have intended to deceive Plaintiff if it had charged Plaintiff for the Vault Storage it misrepresented that it provided.  *See id.*

Plaintiff insists that "'reckless disregard for the consequences'" is sufficient scienter under Georgia law.  Pl.'s Opp'n 30 (quoting *Grizzle v. Guarantee Ins. Co.*, 602 F. Supp. 465, 467 (N.D. Ga. 1984)).  Indeed, "[a] fraudulent or reckless representation of facts as true when they are not, if intended to deceive, is equivalent to a knowledge of their falsehood even if the party making the representation does not know that such facts are false."  Ga. Code Ann. § 51-6-2(b).  In Plaintiff's view, "Recall's statements concerning vault storage clearly meet this threshold, as the statements of Recall's Account Managers were either made without any regard as to whether they were in fact true, or made intentionally to deceive P&F into continuing its relationship with Recall."  Pl.'s Opp'n 30.  Additionally, according to Plaintiff, it properly pleaded intent to deceive by alleging that "Recall's representations were intended to (and did) induce P&F not to terminate its business relationship with Recall, but rather to send additional original signature documents to Recall for vault storage."  *Id.* at 29. Plaintiff contends that, even if Recall did not charge improperly for Vault Storage, "Recall gained the benefit of P&F's continued business, which P&F would have terminated if it had known the truth."  *Id.* at 31–32 (citation to Compl. omitted).

As noted, general allegations of intent and knowledge suffice.  *See* Fed. R. Civ. P. 9(b). Applying Georgia law, courts are "sympathetic that fraud often cannot be pled with certainty before discovery" and therefore will "'look carefully for specific allegations of fact giving rise to a strong inference of fraudulent intent, keeping in mind that the pleading of scienter may not rest on a bare inference that a defendant "must have had knowledge of the facts."'"  *In re Brown*, 457 B.R. 919, 924–25 (Bankr. M.D. Ga. 2011) (quoting *Maldonado v. Dominguez,* 137 F.3d 1, 9–10 (1st Cir. 1998) (citation omitted)).

Plaintiff alleges that Recall received at least five emails from its firm administrator regarding proper storage of its Vault Boxes and Vault Files and, in response, Recall referred to documents that were stored in Vault Storage, when indeed they were not.   Although the statements refer to lists of inventory and data entry, rather than a visual inspection of the Vault Storage, given that Plaintiff repeatedly questioned Recall's storage process and identified errors in the storage of its documents, it was reckless for Recall to provide such assurances without better assessing the circumstances.   Plaintiff also claims that "Recall assured P&F that the 1586-S documents were being stored in the vault to induce P&F to continue the business relationship, but Recall never had any intention to store P&F's documents as designated."   Compl. ¶ 113 (citation to Tiedeman Aff. & Att. F omitted).   It is plausible that Recall provided the assurances to preserve its business relationship with P&F.   Plaintiff alleged scienter and intent to deceive sufficiently to withstand Defendant's Motion to Dismiss its fraud claim.   *See Iqbal*, 556 U.S. at 663, 678–79 (claim is plausible, and therefore adequately stated, when it enables "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged").

## 2.   *Contractual limitations on recovery*

Defendant argues that, even if Plaintiff pleaded fraud sufficiently, "because P&F affirmed the contract following the accident and its discovery that certain cartons were not in the climate controlled locations, it is bound by its terms and may seek only contractual damages." Def.'s Mem. 24.   Additionally, Defendant argues that, "because P&F never rescinded the Agreement, it may not rely on any representations outside the Agreement" because "the Agreement contains a merger clause."[10]   *Id.* at 25.   Defendant cites *Authentic Architectural*

---

[10] A merger, or integration, clause is "[a] contractual provision stating that the contract represents the parties' complete and final agreement and supersedes all informal understandings and oral

*Millworks, Inc. v. SCM Grp. USA, Inc.*, 586 S.E.2d 726, 728-29 (Ga. Ct. App. 2003), and

*Browning v. Stocks*, 595 S.E.2d 642, 644 (Ga. Ct. App. 2004).

In *Authentic Architectural Millworks, Inc.*, the Georgia Court of Appeals stated the well-established principle that a party "claiming he *was fraudulently induced* to enter a sales contract" may pursue one of two possible remedies: "'(1) promptly after discovering the fraud he may rescind the contract and sue in tort for recovery of the purchase price and for any additional damages resulting from the alleged fraud; or (2) he may affirm the contract and sue for damages resulting from the fraud.'"  586 S.E.2d at 728 (quoting *Hightower v. Century 21 Farish Realty*, 448 S.E.2d 271 (1994)) (emphasis added).  The court also observed that the existence of a merger clause will prevent recovery for fraud when the party elects to affirm the contract:

> In an action for fraud, if the defrauded party . . . has elected to affirm the contract, he is relegated to a recovery in contract and the merger clause will prevent his recovery. This result obtains because where the allegedly defrauded party affirms a contract which contains a merger or disclaimer provision and retains the benefits, he is estopped from asserting that he relied upon the other party's misrepresentation and his action for fraud must fail.

*Id.* at 729 (quoting *American Demolition v. Hapeville Hotel Ltd. Partnership*, 413 S.E.2d 749 (1991) (Citations and punctuation omitted.)  The court concluded that the counter-plaintiff affirmed the contract, there was no merger clause to bar the fraudulent inducement claim, and even if there had been a merger clause, it would not have precluded the fraud claim because the claim was based on statements in the contract.  *Id.*

Likewise, in *Browning*, the plaintiffs claimed that the defendant "*fraudulently induced* them to enter into the sales contract to purchase the house." 595 S.E.2d at 643 (emphasis added). There, the court concluded that "[b]ecause the [plaintiffs] elected to affirm the sales contract and

---

agreements relating to the subject matter of the contract."  *Black's Law Dictionary* 649 (Bryan A. Garner ed., abridged 7th ed., West 2000).

pursue the coexisting right to sue in tort for the fraud, they were bound by the terms of the contract and subject to contractual defenses asserted by [the defendant] in the fraud claim," such as the existence of a merger clause, and therefore the defendant "correctly asserted that the [plaintiffs] were estopped from claiming he fraudulently induced them to enter into the contract by *misrepresentations* about the house made outside the contract." *Id.* at 644 (emphasis added). The court nonetheless concluded that the verdict in plaintiffs' favor on the *fraudulent concealment* claim was proper because, unlike when a buyer alleges misrepresentations, "where a buyer affirms the sales contract and sues claiming . . . that the seller actively or passively concealed damage or defects in the purchased property, there is no basis for using an entire agreement clause in the sales contract as a defense to the suit." *Id.* at 646.

Here, Plaintiff does not claim that it was fraudulently induced to enter into the contract, which is not a sales contract.  Rather, Plaintiff claims that it entered into the Agreement for services and then, due to Defendant's *subsequent* fraudulent misrepresentations, failed to terminate the Agreement before damages ensued from Defendant's failure to perform under the Agreement. Therefore, *Authentic Architectural Millworks, Inc*. and *Browning*, which address claims of fraudulent misrepresentations and fraudulent concealment prior to or coinciding with a sales contract, are inapposite.  Certainly, when a contract contains a merger clause, violations of "*prior or contemporaneous* representations that contradict the written contract 'cannot . . . amount to actionable fraud,'" because a "merger clause . . . precludes any subsequent claim of deceit based upon *pre-contractual* representations." *First Data POs, Inc. v. Willis*, 546 S.E.2d 781, 794, 795 (Ga. 2001) (quoting *Campbell v. C&S Nat'l Bank*, 415 S.E.2d 193 (1992)) (emphases added).  But, Defendant has not identified any authority that applies these limitations under the circumstances of this case, in which Plaintiff's fraud claim is based on

misrepresentations that *postdated* the Agreement.  Indeed, the merger clause itself provides that "the[] terms and conditions [of the Agreement] constitute the entire agreement between Recall and [P&F] with respect to the subject matter hereof and supersede any *prior* discussions, agreements and representations." Agr. ¶ 16 (emphasis added).  Defendant's Motion to Dismiss or otherwise limit Plaintiff's fraud claim is denied.

### D.  Count VI – Unfair Business Practices under the FBPA and MCPA

The FBPA provides that "[u]nfair or deceptive acts or practices in the conduct of consumer transactions and consumer acts or practices in trade or commerce are declared unlawful."  Ga. Code Ann. § 10-1-393(a). Similarly, the MCPA provides that "[a] person may not engage in any unfair or deceptive trade practice … in "[t]he sale … or bailment of any consumer services," Md. Code Ann., Com. Law § 13-303(1).  Both acts state that unfair or deceptive trade practices include "[r]epresenting that … services have … characteristics [or] benefits … that they do not have."  Ga. Code Ann. § 10-1-393(b)(5); *see* Md. Code Ann., Com. Law § 13-301(2)(i). Additionally, both acts provide that "any person"[11] injured by a violation of the act may bring a private action.  Ga. Code Ann. § 10-1-399(a); Md. Code Ann., Com. Law § 13-408(a).

In Count VI – Unfair Business Practices, Plaintiff claims that Defendant violated the FBPA and the MCPA because "Recall's willful misrepresentations as to the proper handling of P&F's Safe documents, and on which P&F relied, constituted unfair, deceptive, or otherwise prohibited business practices."  Compl. ¶ 123.  Defendant argues that this claim fails because

---

[11] The law firm of Pasternak & Fidis, P.C. qualifies as a "person" under both acts.  *See* Md. Code Ann., Com. Law § 13-101(h) ("'Person' includes an individual, corporation, business trust, statutory trust, estate, trust, partnership, association, two or more persons having a joint or common interest, or any other legal or commercial entity."); Ga. Code Ann. § 10-392(a)(24) ("'Person' means a natural person, "corporation, trust, partnership, incorporated or unincorporated association, or any other legal entity.").

P&F "is not a 'consumer'" under the FBPA or the MCPA, and the Agreement "is not a 'consumer transaction' or a contract for 'consumer services' under either act," because it did not involve a service "'primarily for personal, family or household purposes.'"  Def.'s Mem. 26–27 (quoting Ga. Code Ann. § 10-1-392(a)(6), (10)); *see id.* at 28 (quoting Md. Code Ann., Com. Law § 13-101(d)(1)).  Plaintiff counters that it can bring claims under both acts, notwithstanding the definitions of "consumer" and "consumer transaction" or "consumer services" under both acts, because the FBPA "was enacted to 'protect consumers *and legitimate business enterprises* from unfair or deceptive practices *in the conduct of any trade or commerce*,'" Pl.'s Opp'n 35 (emphasis added by Plaintiff), and "the word 'personal' within [the MCPA] definition [of consumer services] must be reconciled with the statutory definition of 'person' [able to bring an MCPA action,] which expressly includes a 'corporation … or any other legal or commercial entity,'" *id.* at 40.

As for the MCPA, Plaintiff has not cited any authority for its contention that a business can maintain a cause of action under the MCPA, and my independent research has not uncovered any.  Rather, this Court repeatedly has concluded that businesses lack standing to bring a claim under the MCPA.  *E.g.*, *Putt-Putt, LLC v. 416 Constant Friendship, LLC*, 936 F. Supp. 2d 648 (D. Md. 2013); *Custom Direct, LLC v. Wynwyn, Inc.*, No. RDB-09-2348, 2010 WL 1794248 (D. Md. May 4, 2010).  In *Putt-Putt*, this Court dismissed an MCPA claim brought by a business against its competitor, concluding that the plaintiff, who alleged an MCPA violation based on the defendant's use of the plaintiff's "federally trademarked terms and designs," was not a consumer and therefore had "no standing to sue under the MCPA."  936 F. Supp. 2d at 651, 660; *see Scotch Whisky Ass'n v. Majestic Distilling Co.*, 958 F.2d 594, 597 n.9 (4th Cir. 1992) (eliminating trade association's claim under MCPA because plaintiff did not "come within

[MCPA] definition of consumer"; noting that, in *Layton v. AAMCO Transmissions, Inc.*, 717 F.

Supp. 368, 371 (D. Md. 1989), this Court concluded that the MCPA "only provides a cause of

action for consumers").

In *Custom Direct*, the plaintiff brought a trademark infringement claim under the MCPA

against its former internet marketing provider.   2010 WL 1794248, at *1–2.   Notably, like P&F,

Custom Direct purchased services from the entity it sued under the MCPA.   *See id.*   The

defendant moved to dismiss on the basis that the plaintiff was not a "consumer" under the

MCPA, and the plaintiff countered that "since MDTPA[12] § 13–408(a) states that 'any person

may bring an action to recover for injury or loss' under the statute, and § 13–101(h) defines the

word 'person' to include a corporation, partnership or association, it is protected by the statute

and able to seek redress."   *Id.*   at *2.   This is the same reasoning Plaintiff promotes.   *See* Pl.'s

Opp'n 40.   This Court dismissed Custom Direct's MCPA claim, reasoning, *id.*:

> In *Penn–Plax, Inc. v. Schultz, Inc.,* 988 F.Supp. 906, 910 (D. Md. 1997), this
> Court rejected the argument that the MDTPA's definition of "person" gives
> corporate plaintiffs standing to sue under the MDTPA. As this Court explicitly
> stated in *Penn–Plax:* "[T]here is no competitor standing under the [MDTPA]." *Id.*
> Accordingly, Custom Direct does not have standing to bring a claim under the
> MDTPA.

And, the Maryland Court of Appeals has stated that "[t]he Maryland Act does not provide a

cause of action for businesses against other businesses," reasoning that "the deceptive trade

practice must occur in the sale or offer for sale to the consumer."   *Morris v. Osmose Wood*

*Preserving*, 667 A.2d 624, 634 (Md. 1995).

With regard to the Georgia statute, Plaintiff is correct that *Inkaholiks Luxury Tattoos*

*Georgia, LLC v. Parton*, 751 S.E.2d 561, 563 (Ga. Ct. App. 2013), on which Plaintiff relies,

---

[12] The Court refers to the subsection of the MCPA concerning unfair and deceptive trade
practices as the Maryland Deceptive Trade Practices Act, or MDTPA, in *Custom Direct.*

provides that "[t]he FBPA protects *businesses* from unfair or deceptive practices in the conduct of trade or commerce." *Id.* at 563 (emphasis added).   But, in that case, the plaintiffs, a tattoo parlor named Inkaholics, LLC and its owner, did not present themselves as the "consumer" or the recipient of services primarily for personal use.   *See id.*   Rather, they claimed that "Inkaholics" was their trade name and that defendants' use of the name "Inkaholiks" in the same industry and same geographic area infringed their trade name.   *Id.*   It appears that their claim fell within the FBPA because it involved the defendants' allegedly unfair or deceptive trade practices with potential customers, who were consumers and sought the defendants' services for personal purposes.   *See id.*   at 563–64 (noting that "plaintiffs presented evidence showing . . . that the defendants' subsequent use of the similar name Inkaholiks in the same area infringed on the plaintiffs' trade name by causing the tattoo-buying public in the area to confuse the defendant's services for the plaintiffs' services").   In this manner, the FBPA "protect[s] … legitimate business enterprises," i.e., those that do not engage in unfair and deceptive trade practices, "from unfair or deceptive practices [that other businesses employ] in the conduct of any trade or commerce in part or wholly in the state." § 10-1-391(a).   And, although *Friedlander v. PDK Labs, Inc*., on which Plaintiff also relies, provides that "if a business, *as a consumer*, sustains damage, it may bring suit under [the FBPA]," 465 S.E.2d 670, 671 (Ga. 1996) (emphasis added), Defendant is correct that the January 22, 1996 holding preceded "the Georgia General Assembly['s] amend[ment] [of] the definition of 'consumer,' limiting 'consumers' to natural persons," which the governor signed on April 15, 1996, and which had an effective date of July 1, 1996.   Def.'s Reply 18; *see* Ga. HB 1632, Def.'s Reply Ex. C, ECF No. 13-3 (addition of definition of consumer as "natural person").

Further, the services at issue are not "consumer transactions" or "consumer services" under the plain language of either act. The FBPA defines "consumer" as "a natural person," Ga. Code Ann. § 10-1-392(a)(6), while the MCPA provides a broader definition: "'Consumer' means an actual or prospective purchaser … or recipient of … consumer services…." Md. Code Ann., Com. Law § 13-101(c)(1). The FBPA defines "consumer acts or practices" as "acts or practices intended to encourage consumer transactions," which are "the sale, purchase, lease, or rental of goods, services, or property, real or personal, *primarily for personal, family, or household purposes*." Ga. Code Ann. § 10-1-392(a)(7), (10) (emphasis added). Similarly, the MCPA defines "consumer services" as "services which are *primarily for personal, household, family,* or agricultural *purposes*." Md. Code Ann., Com. Law § 13-101(d)(1) (emphasis added).

To construe a statute, the Maryland courts "'begin with the plain language of the statute … to ascertain and effectuate the intent of the Legislature.'" *Nimro v. Holden*, ---- A.3d ----, 2015 WL 848164, at *6 (Md.App. Feb. 27,2015) (quoting *Baltimore County v. Baltimore County Fraternal Order of Police Lodge No. 4,* 96 A.3d 742, 756–57 (Md. 2014) (citations and quotation marks omitted)). "If the language is unambiguous, [the courts] do not ordinarily look beyond the language of the statute." *Gomez v. Jackson Hewitt, Inc*., 16 A.3d 261, 274-75 (Md. Ct. Spec. App. 2011). The courts "'seek to avoid constructions that are illogical, unreasonable, or inconsistent with common sense,'" or that "'render any word, clause, sentence or phrase of a statute meaningless.'" *Nimro*, 2015 WL 848164, at *6 (quoting *Balt. Cnty*., 96 A.3d at 756–57) (citations and quotation marks omitted). Georgia courts apply the same principles of statutory construction. *See Schorr v. Countrywide Home Loans, Inc.*, No. 07-cv-19 (WLS), 2013 WL 3786631, at *3 (M.D. Ga. July 18, 2013) ("[T]he initial rule of statutory construction [regarding Georgia statutes] is to look to the legislative intent and to construe statutes to effectuate that

intent. . . . [W]hile the legislative intent prevails over the literal import of words, where the statutory language is plain and susceptible of but one natural and reasonable construction, the court has no authority to place a different construction upon it, but must construe it according to its terms. To this end, the court is not authorized to disregard any of the words [of a statute] unless the failure to do so would lead to an absurdity manifestly not intended by the legislature. The court must construe the statute so as to give sensible and intelligent effect to all of its provisions and should refrain, whenever possible, from construing the statute in a way that renders any part of it meaningless.").

"[N]atural person," "personal, family, or household purposes," and "personal, household, family, or agricultural purposes" are unambiguous terms that should be given their plain meaning. *See Gomez*, 16 A.3d at 274–75.  Certainly, Plaintiff sought document storage services from Defendant as a customer.  But, Plaintiff is a purchaser of storage services for its business and not an individual or "natural person."  It claims that, "[i]ncluded in the *services P&F provided for its clients* was preparation of, *and secure storage of*, wills and other estate planning and administration documents bearing original signatures of P&F clients," and it alleges that it stored original-signature documents, as well as client files, at Defendant's facility.  Compl. ¶¶ 10, 13 (emphasis added).  Thus, the services at issue were for Defendant to store a law firm's clients' documents for the firm, as a part of the law firm's business, as well as to store the law firm's files.  Put another way, the services were for business, not for personal, household, or family, purposes.  Thus, Plaintiff does not qualify as a consumer under the FBPA or the MCPA, as the business transactions between Plaintiff and Defendant did not constitute either "consumer transactions" or "consumer services."   Because Plaintiff only alleges misrepresentations regarding services for business purposes—services that Plaintiff in turn provides to its

customers—, the alleged misrepresentations cannot form the basis of an FBPA or MCPA claim. *See Boatel Industries, Inc. v. Hester*, 550 A.2d 389, 398–99 (Md. Ct. Spec. App. 1988) (concluding that individual appellees were "disqualified from recovering under" the MCPA when "[t]he record … provide[d] no support for the assertion that Hester either bought or used the yacht primarily for personal, family, or household purposes" and instead, "Hester's own testimony with regard to his initial purchase of the boat, as well as his subsequent use of the boat, establishes that he anticipated substantial business related benefits from his use of the boat"); *Kason Indus., Inc. v. Component Hardware Grp., Inc.*, 120 F.3d 1199, 1204 (11th Cir. 1997) ("The Georgia Supreme Court has refused to 'expand the coverage of the Act to the commercial market as a whole, reading a consumer marketplace requirement into the statute, so that a defendant who sells a product to retailers is not within the scope of the act." (citing *State ex rel. Ryles v. Meredith Chevrolet, Inc.*, 244 S.E.2d 15, 18–19, *aff'd*, 249 S.E.2d 87 (1978))). Plaintiff's claims under the MCPA and FBPA are dismissed. *See* Fed. R. Civ. P. 12(b)(6).

### III. MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION

A party may move to dismiss a complaint pursuant to Fed. R. Civ. P. 12(b)(1), which provides that a party may assert lack of subject matter jurisdiction by motion as a defense to a claim for relief. "A court should grant a Rule 12(b)(1) motion 'if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law.'" *El-Amin v. Int'l Longshoremen's Ass'n Local No. 333*, No. CCB-10-3653, 2011 WL 2580630, at *2 (D. Md. June 28, 2011) (quoting *Evans v. B.F. Perkins, Co.*, 166 F.3d 642, 647 (4th Cir. 1999)).

Here, Plaintiff asserts that the Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(1), "as this action involves a controversy between citizens of different states and the amount in controversy exceeds the sum of seventy-five thousand dollars ($75,000), exclusive of

interest and costs." Compl. ¶ 8. For the Court to have diversity jurisdiction, "the matter in controversy [must] exceed[] the sum or value of $75,000, exclusive of interests and costs, and [be] between . . . citizens of different States." 28 U.S.C. § 1332(a)(1). Defendant does not dispute the diversity of citizenship, arguing instead that, without the gross negligence and unfair business practices claims, which it believes must be dismissed, "there is no subject matter jurisdiction to consider [the remaining claims] because P&F's damages are measured by the Agreement and thus are valued at $620.00." Def.'s Mem. 39. However, I am denying Defendant's Motion to Dismiss the gross negligence and fraud claims, and I conclude that the Agreement does not limit Defendant's liability for the fraud claim. Plaintiff seeks "actual, benefit-of-the-bargain, out-of-pocket, and compensatory damages in an amount of no less than $2,800,656 and punitive damages." Compl. 28. Because Plaintiff has stated claims for gross negligence and fraud, and because the contractual limitation does not apply to the fraud claim, Plaintiff meets the jurisdictional minimum. Defendant's Motion to Dismiss pursuant to Rule 12(b)(1) is denied. *See* Fed. R. Civ. P. 12(b)(1).

## IV.    MOTION FOR SUMMARY JUDGMENT

### A.  Standard of Review

Summary judgment is proper when the moving party demonstrates, through "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials," that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a), (c)(1)(A); *see Baldwin v. City of Greensboro*, 714 F.3d 828, 833 (4th Cir. 2013). If the party seeking summary judgment demonstrates that there is no evidence to support the nonmoving party's case, the burden shifts to

the nonmoving party to identify evidence that shows that a genuine dispute exists as to material facts.  *See Celotex v. Catrett*, 477 U.S. 317 (1986).  A "genuine" dispute of material fact is one where the conflicting evidence creates "fair doubt"; wholly speculative assertions do not create "fair doubt."  *Cox v. Cnty. of Prince William*, 249 F.3d 295, 299 (4th Cir. 2001); *see also Miskin*, *v. Baxter Healthcare Corp.*, 197 F. Supp. 2d 669, 671 (D. Md. 1999).  The existence of only a "scintilla of evidence" is not enough to defeat a motion for summary judgment.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986).  Instead, the evidentiary materials submitted must show facts from which the finder of fact reasonably could find for the party opposing summary judgment.  *Id.*

### B.  Discussion

Defendant argues that summary judgment in its favor is appropriate based on accord and satisfaction.  Def.'s Mem. 42.

> Accord and satisfaction is a method of discharging a contract or cause of action, whereby the parties agree to give and accept something in settlement of the claim or demand of the one against the other, and perform such agreement, the 'accord' being the agreement, and the 'satisfaction' its execution or performance.

*Weston Builders & Developers, Inc. v. McBerry, LLC*, 891 A.2d 430, 448 (Md.App.,2006) (quoting *Jacobs v. Atlantco Ltd. Partnership*, 373 A.2d 1255, 1258 (Md. App. 1977) (quoting 1 C.J.S., *Accord and Satisfaction*, § 1 (1936 & Supp. 1976)) (quotation marks omitted)). Unsurprisingly, "it is composed of two distinct elements": (1) an accord, which "is an agreement by one party to give or perform and by the other party to accept, in settlement or satisfaction of an existing or matured claim, something other than that which is claimed to be due," and (2) the satisfaction, which "is the execution or performance of the agreement, or the actual giving and taking of some agreed thing."  *Weston Builders*, 891 A.2d at 448 (quoting *Jacobs*, 373 A.2d at 1258 (quoting 1 Am. Jur. 2d, *Accord and Satisfaction*, § 1 (1962 & Supp. 1976)) (quotation

marks omitted)).  Simply put, "[t]he *accord is the agreement* and the satisfaction is the execution

or performance of such agreement."  *Id.*  (citations and quotation marks omitted).  Both elements

must be present to "bar . . . the assertion of the original claim."  *Id.* (citations and quotation

marks omitted).

According to Defendant, on June 12, 2013, it offered Plaintiff a $43,320 credit "as part of

the customer credit program to resolve any existing or potential claims arising from the collapse

and to maintain business relationships," and Plaintiff accepted the credit.  Def.'s Mem. 42–43.

In its view, "P&F thus has received compensation far in excess of the $620.00 in contract

damages."  *Id*. at 43.    Defendant attaches the affidavit of Debbie Garrett, the Cash

Applications/Collections Manager for Recall Corporation, Americas, accompanied by exhibits

that show the correspondence between the parties with regard to the credit and Plaintiff's

increasing outstanding invoices.  ECF No. 5-5.  These attachments demonstrate that the credit

was applied to Plaintiff's account beginning in July 2013, and Plaintiff neither rejected the credit

nor officially ended its business relationship with Defendant.  *See* Garrett Aff. ¶¶ 3, 8, 13 & Exs.

B–C (email correspondence; invoices showing application of credit).

Garrett also attaches a February 21, 2013 letter to P&F from Recall, offering a credit in

excess of $42,000, in an amount not yet determined, as "a complete resolution of any and all

claims arising from the loss or destruction of cartons due to the roof collapse at Recall's

Landover facility, and any events thereafter related."  Garrett Aff. Ex. A.  The letter asks P&F

for its "acceptance of these credits from Recall as full settlement of any and all potential claims,"

and states that "[o]nce [P&F] indicated [its] acceptance of this proposal, Recall will promptly

issues these credits in the form of a credit memo which will be mailed directly to [P&F]."  *Id*.

The letter is unsigned by either party.  *See id.*  No "credit memo" is attached.

Plaintiff contends that it did not receive the letter offering the credit until October 2013, and that the credit that preceded it "was unaccompanied by any terms whatsoever." Pl.'s Opp'n 47. Plaintiff attaches two affidavits with exhibits to support its argument. Tiedeman Supp. Decl., ECF No. 12-2; Myers Supp. Decl., ECF No. 12-3. Tiedeman, P&F's firm administrator, states that "P&F received a copy of the June 12, 2013 credit memo from Recall, but the June 12, 2013 credit memo contained no information about what it pertained to or how it was calculated." Tiedeman Supp. Decl. ¶ 21. According to Tiedeman, she "did not email [Recall] any authorization to apply the credit to P&F's invoices," but rather left a voice mail message, directing Recall's general counsel to be in touch with P&F's attorneys. *Id.* ¶ 22. She states that she first learned of the February 21, 2013 letter on October 29, 2013. *Id.* ¶ 26.

Plaintiff's counsel, Stacey H. Myers, states that the parties entered into a tolling agreement "to allow time for Recall and P&F to attempt to resolve their dispute" on June 24, 2013, and for months thereafter the parties continued to communicate about settlement. Myers Supp. Decl. ¶¶ 3–4, 10, 12–14 & Att. A–G (tolling agreement and addenda; written correspondence about settlement). Myers states that she told Defense counsel on January 28, 2014 "that a $43,320 credit was not acceptable to P&F as a resolution for this matter." *Id.* ¶ 8. In an October 18, 2013 email, Defense counsel said that it was her "understanding that Recall previously made an offer that exceeds the requirements of the Service Agreement," but "Recall [was] willing to consider and discuss other options that Pasternak & Fidis may propose." *Id.* Att. B.

Thus, it is undisputed that Recall gave Plaintiff a $42,320 credit. The issue is whether Plaintiff accepted the credit to satisfy the "accord" element of accord and satisfaction. *See Weston Builders*, 891 A.2d at 448. Defendant insists that "[i]t is well-established in Maryland

that, when a plaintiff accepts a tender and appropriates the defendant's money, it has accepted the offer regardless of whether that acceptance is accompanied by a verbal dissent."  Def.'s Mem. 43 (citing *Kimmel v. SAFECO Ins. Co*., 696 A.2d 482, 487 (Md. Ct. Spec. App. 1997)). Significantly, in *Kimmel*, the court affirmed summary judgment in the insurer's favor based on plaintiff's acceptance of a check—not a credit—from the insurer.  Unlike a check, for which a party needs to act affirmatively to cash or deposit it, thereby indicating acceptance, a credit can be applied to a party's account without any action by that party.  And, as Plaintiff sees it, this case "contrasts sharply with the 'check cashing' cases upon which Recall relies, Br. at 43-44, where the checks were accompanied by language stating that by cashing the check, the liability would be discharged."  Pl.'s Opp'n 47 n.11.

The record before me shows that Defendant credited Plaintiff's account $42,320 and also that Plaintiff never manifested acceptance of the credit.  The record also demonstrates that the parties actively negotiated and pursued mediation to resolve the dispute after the credit was applied, belying the suggestion that the credit resolved the dispute.  Additionally, Plaintiff's firm administrator states that the credit's presence in Plaintiff's account with Defendant was meaningless because Plaintiff had stopped paying its invoices and had no intention to make any future payments to Defendant.  Tiedeman Supp. Aff. ¶ 30.  Thus, a genuine dispute exists as to whether Plaintiff accepted the credit, which is a material fact.  *See Weston Builders*, 891 A.2d at 448.  Consequently, Defendant has not shown that no genuine dispute exists as to material fact, and therefore it is not entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(a). Defendant's Motion for Summary Judgment is denied.

## V.       CONCLUSION

In sum, Defendant's Motion to Dismiss is granted in part and denied in part, and Defendant's Motion for Summary Judgment is denied as to the affirmative defense of accord and satisfaction.  Specifically, Defendant's Motion to Dismiss pursuant to Fed. R. Civ. P. 12(b)(6) is denied as to Plaintiff's gross negligence and fraud claims, and granted as to Plaintiff's unfair business practices claims; Defendant's Motion to Dismiss pursuant to Fed. R. Civ. P. 12(b)(1) is denied.  Defendant will file its Answer by April 20, 2015.

A separate order shall issue.


Dated: <u>March 25, 2015</u>                                   _____/S/_____
                                                              Paul W. Grimm
                                                              United States District Judge

lyb